UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SAMUEL FREEMAN,               )
                              )
          Petitioner,         )
                              )
     v.                       )          No.  4:09CV1989 TIA
                              )
TROY STEELE,[1]               )
                              )
          Respondents.        )

## MEMORANDUM AND ORDER

This cause is before the Court on Missouri state prisoner Samuel Freeman's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (filed December 4, 2009/Docket No. 1). The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

On November 14, 2005, Petitioner was charged in the Circuit Court with class A felony murder in the first degree and forcible sodomy. (Resp. Exh. 6 at 8-9). On August 9, 2006, the State of Missouri dismissed the forcible sodomy count. (Resp. Exh. 8 at 1). On September 9, 2006, a jury found Petitioner guilty of murder first degree. (Resp. Exh, 6 at 11). On November 16, 2006, the Circuit Court sentenced Petitioner to a term of imprisonment for life without eligibility for probation or parole. (Resp. Exh. 6 at 41-44). Petitioner filed a notice of appeal on November 17, 2006. (Resp. Exh. 6 at 46). The Missouri Court of Appeals, Southern District, found the evidence was insufficient to support Petitioner's conviction and reversed the Circuit Court's judgment and remanded for entry of a judgment of acquittal on January 16, 2008. (State v. Freeman, 2008 WL 142299 (Mo. Ct. App.

---

[1]Petitioner is presently incarcerated at the Potosi Correctional Center ("PCC") in Potosi, Missouri. Inasmuch as Troy Steele is superintendent of PCC and thus is Petitioner's custodian, he should be substituted for Don Roper as proper party respondent. Rule 2(a), Rules Governing Section 2254 Cases in United States District Courts.

S.D.) ;Resp. Exh. 12). On transfer from the Court of Appeals, the Missouri Supreme Court affirmed the judgment of the Circuit Court finding that Petitioner failed to show his conviction rested on insufficient evidence, or the trial court committed an abuse of discretion in making its evidentiary rulings. (State v. Freeman, 269 S.W.3d 422 (Mo. 2008) (en banc)). Petitioner pursued no other action in state court. The instant petition for writ of habeas corpus was filed on December 4, 2009.

Petitioner is currently incarcerated at the Potosi Correctional Center in Potosi, Missouri, pursuant to the sentence and judgment of the Circuit Court of Ripley County, Missouri. In the instant petition for writ of habeas corpus, Petitioner raises four grounds of insufficient evidence presented in his direct criminal appeal for relief:

> (1)     That the Missouri Supreme Court made an unreasonable finding of fact in determining that the DNA on the toilet paper in the victim's apartment came from two persons, Petitioner and the victim contrary to the testimony of the State's expert;
>
> (2)     That the Missouri Supreme Court unreasonably determined that given the proximity of the club to the victim's apartment, Petitioner had time to get to the victim's apartment;
>
> (3)     That the Missouri Supreme Court unreasonably determined that the liquor bottle Petitioner took with him from the club was inconsistent with the instrument that caused the victim's injuries; and
>
> (4)     That the Missouri Supreme Court unreasonably applied Jackson v. Virginia.

Respondent contends that although Petitioner breaks his petition into four grounds for relief, each claim is actually an attack on the finding of the Missouri Supreme Court that there was sufficient evidence to convict Petitioner of first degree murder under the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979). Respondent further argues that the Missouri Supreme Court properly determined the claims on their merits and thus that the claims should be denied here.

Evidence presented at trial by the State was summarized, in relevant part, by the Missouri Court of Appeals as follows:

> In 1992, Defendant and Victim were both members and frequent patrons of the VFW club on South Broadway in Poplar Bluff. Defendant had recently returned to Poplar Bluff after serving in the Army. Victim worked as a pharmacy technician at the Veterans' Administration hospital. While they had previously been acquainted with each other, they were not romantically involved and had never dated. Both were at the VFW club the evening of May 6, 1992.

> The club was a private club, patronized by members and their guests. In addition to a bingo hall, there was a separate bar area referred to by the veterans as the canteen. A pool table was located in the canteen, as well as video games, a jukebox, tables and chairs, and a full-service bar with seating.

> Candace Shipman ("Candace") was working as a barmaid and reported for her evening shift on May 6 around 4:45 p.m., relieving Bridgette Russom ("Bridgette"), who was the daytime bartender. Both Victim and Defendant were in the club at the same time during a four to five hour period that evening. Throughout the evening, Candace waited on customers, cleaned, and stocked coolers. She served Victim Miller Lite beer in cans, and Defendant was drinking Budweiser beer and shots of Galliano. Candace estimated she probably served Defendant several beers and two or three shots of Galliano that night. Bridgette remained at the club and met her fiancé there after her shift ended. Victim joined Bridgette and her fiancé at the bar.

> Robert McSwain was also present at the VFW club that night. Robert was "a regular" at the club, and there was testimony that Victim was "head over heels in love with him." Jimmy Reed, a co-worker and friend of Victim, testified that Victim and Robert had an "on again off again, boyfriend and girlfriend" relationship and described it as a "love-hate relationship." He stated that the relationship had been ongoing for about six or seven years.

> Robert was joined by his son, Richard, and Richard's friend, and all three played a couple of games of pool. Before they finished their games, Defendant indicated that he wanted a turn at the pool table, and Robert told Defendant he would have to wait his turn. Richard testified that Defendant was "upset" and had a "[d]isgruntled look" on his face.

> Afterward, Victim approached Defendant and told him to leave the boys alone. Richard testified that he could see they were arguing, that their "voices were raised a little bit." Candace stated that Victim was "upset" and "vocal," but she did not hear what was said. Bridgette testified that she did not "know that anybody was

angry"; that Defendant "seemed a little agitated" by the look on his face. Defendant stated that Victim thought he was trying to hustle the boys in a pool game, and that it was no big deal. This encounter lasted "just a matter of seconds." Soon afterward, Defendant flirted with and offered to buy Victim a drink, however she declined, and he returned to playing the video games.

Closing time for the VFW club was usually 11:00 p.m., but on the night of May 6, 1992, Candace closed the bar earlier. After she gave the last call for drinks, Defendant finished his drink and left the bar to walk home. Defendant lived approximately one mile from the VFW club. He left with a Galliano bottle which Candace had given him after emptying it for Defendant's last shot.

A Galliano bottle has a distinctive shape in that it has a typical round bottle top that then, in a continuous flow, flares from the top to the base in an alternating round and twelve-sided polygonal shape. The glass is rounded at the bend defining each edge between the sides of the polygon. It does not, unlike most wine, liquor, and beer bottles, have two parts-a barrel on the bottom part and a neck on the top-with the neck connected by a flange at the top of the barrel.

Approximately fifteen minutes after Defendant left the VFW, Candace, Bridgette, and Victim left the club together. Victim left with a paper bag containing six cans of Miller Lite, which she had purchased earlier in the evening, and she got into her car. She declined Bridgette's offer to follow her home. Upon exiting the parking lot, Bridgette turned left, and Victim continued driving toward her apartment, which was seven or eight blocks from the VFW club.

Everett Nichols, a neighbor of Victim, testified that he was at home with his girlfriend watching television when he heard a car drive up. When he looked out the window, he saw Victim retrieve a package from the passenger side of the car and walk toward her apartment door. He did not know what time this occurred, but he testified that the television program "Hunter" had just started. It appeared to him that Victim had some difficulty opening her door. He also noticed a man coming from behind her. They went into her apartment, and he did not hear anything else.

Victim's body was discovered in her apartment bedroom in Poplar Bluff by her mother the next day on May 7, 1992, shortly after 1:00 p.m. She was found lying on her back, her head at the foot of the bed and her feet at the head of the bed, with blankets partially covering her nude body. Knotted around her neck was a nylon knee-length stocking. Another stocking was on her right foot.

After the authorities were contacted, the first responding officer arrived at 1:49 p.m. Shortly thereafter, Poplar Bluff police detective Donwell Clark arrived and took charge of the scene. He was later joined by Butler County's deputy coroner,

Bruce Goin, who assisted Clark in processing evidence collected from Victim's bedroom.

The next day, May 8, 1992, Detective Clark and deputy coroner Goin attended the autopsy on Victim's body in Farmington. Dr. Steven Parks, who did the autopsy, died before Defendant's trial. At trial, Michael Zaricor, D.O., testified regarding Dr. Parks' autopsy report. To prepare for his testimony, Dr. Zaricor reviewed the "autopsy report, the death certificate, the examination by Donwell Clark of the scene, and his report from being at the autopsy, [and] the photographs of the scene, and photographs taken at the time of the autopsy."

The autopsy report prepared by Dr. Parks noted that "asphyxial death from ligature strangulation" was the cause of Victim's death and placed the time of death at midnight. Dr. Zaricor testified that a determination as to a time of death "is really difficult." He could not offer an opinion based upon a reasonable degree of medical certainty as to the time of Victim's death. He stated that Dr. Parks would have been better prepared and would have more information to offer that opinion than he.

The autopsy report noted that Victim's larynx was fractured, and there were fractures in the hyoid bone. Dr. Zaricor did not believe that the nylon-stocking ligature found tied around Victim's neck caused these fractures, although the ligature probably was the cause of petechial hemorrhages in the eye, and he offered his opinion that the fractures were caused by manual strangulation.

There appeared to be no external injuries to Victim's head, however, after incising the scalp, Dr. Parks found a 6-cm. "subcutaneous hematoma" (an area of hemorrhage) behind her right ear. Dr. Parks concluded that it occurred before her death. Dr. Zaricor opined that the injury resulted from "[s]ome sort of blow to the head" caused by "an instrument, ... a fall[,]" or a fist. He explained that had it been caused by an instrument of some sort, "it wasn't struck hard enough to split the skin, because [Dr. Parks] didn't notice anything externally." Dr. Zaricor suggested it may have been "[s]omething with a smooth surface."

The autopsy also revealed bruises (contusions) outside and inside of the left thigh and on both buttocks adjacent to the vaginal opening. Dr. Zaricor believed these injuries occurred "just before or during the time of death." An examination inside the vagina revealed an abrasion (cut or break in the skin) within a contusion, and "bruising and linear abrasions next to the cervix" caused by penetration by "[s]omething other than a penis[.]" Dr. Zaricor expressed his opinion that what might have caused these injuries was "[s]omething relatively sharp ... not a blunt thing ... probably a sharp, rounded surface ... [s]omething rigid enough, with a corner or edge to it, that could tear that." Although he stated he was "not familiar with dildos," he supposed "something like that, or something of that shape could cause it," however

he did not "remember ever seeing anything like that that sharp." Pressed to provide more detail regarding what object might inflict such injuries, Dr. Zaricor stated, "It has to be narrow enough to fit in there, and long enough to reach the paracervical area in the vagina. We are talking probably six or eight inches long." In terms of the diameter of such an object, Dr. Zaricor testified:

> That could vary. If it is something rigid it doesn't have to be of any specific diameter, but the bruising caused to the buttocks indicated that it had to be long enough to damage that while still being in there, or to damage it by contusing it as it was inserted in and out. It probably would have to have a wider flange at the base.
> ....
>
> To insert that to the depth that it was inserted and cause the bruising of the buttocks, it either has to be ripped from side to side, or as it is inserted it is bruising. Then it has to have a wider flange at the bottom.


Dawn Kliethermes, a criminalist/latent print examiner employed at the Missouri State Highway Patrol Crime Laboratory testified regarding further evidence obtained at the scene of Victim's death. Initially she noted: "A fingerprint, we may also refer to is a latent print. That is a reproduction of the friction ridges that are left on an item or object that has been touched by an individual." Very little fingerprint evidence was obtained from the scene. There was one latent print recovered from a beer can found in a trash can, which was later matched with the index finger of Victim's right hand. Two other fingerprints were recovered, although the witness was "not positive where these [two] prints are coming from." One fingerprint which was determined to be "suitable for comparison purposes," was not matched to either Victim or Defendant, and another print was found to be not "suitable for comparison purposes." The witness conceded that the fingerprint evidence did not link Defendant to the crime scene.

The jury heard testimony from Jason Wycoff, a DNA analyst/criminalist with the Missouri State Highway Patrol Crime Laboratory in Jefferson City for "over ten years," beginning in 1996. Wycoff explained that deoxyribonucleic acid ("DNA") is a molecule within the nucleus of a cell in the body. Providing a background for the testing process, Wycoff testified that cellular material, which he also referred to as DNA "stain," that could yield DNA includes "skin cells, hair cells, sperm cells, blood, and so forth." Blood and saliva "are generally known to house quite a bit of the cellular material for DNA." DNA is found in white blood cells in the blood, sperm cells in semen, and "epithelial cells or skin cells inside the mouth in saliva."

Non-fluid stain examples would include skin cells, the most widely observed example of which is dandruff.

According to Wycoff, DNA can transfer. One can transfer one's own DNA by shaking hands or touching someone else, i.e., skin-to-skin transfer. Transfers of one's DNA can occur by skin contact with an object, such as skin to clothing. Transfer can also occur in the other direction. The DNA of someone who has previously worn that clothing can transfer to the skin of someone who later wears that clothing. In such a situation, Wycoff would expect to find a mixture consisting of the DNA from both persons. Transfer can occur between two people or a person and an object without any physical contact. For example, saliva, mucus, or sweat is propelled from one's body, by a natural movement or reflex such as talking or coughing, sneezing, or swinging an arm, and deposits itself on another person or their clothing. Wycoff noted that "[w]et stains tend to transfer more easier [sic] than dry stains do."

Wycoff could not say when the DNA were transferred to the items tested, and could not say how the various DNA were transferred. He stated that one explanation for the transfer of 0.0125 of one-billionth of a gram could be possibly explained by saying there was very slight transfer of a profile DNA; that it is possible that someone putting their hands on a surface and another person wiping a sleeve upon that surface could potentially transfer DNA.

Because of the ease with which DNA can be transferred, it can be transferred, Wycoff explained, during the collection and testing of evidence. This type of transfer is referred to by law enforcement as "contamination" which occurs, according to Wycoff, "when [DNA] shows up where it shouldn't be." For example, the DNA of the analyst is transferred to a piece of evidence while it is being analyzed, or DNA is transferred by one piece of evidence coming into contact with another piece of evidence. This latter type of transfer is sometimes referred to as cross-contamination. Wycoff indicated that precautions to avoid any contamination in the process of collecting DNA evidence should include: changing gloves before handling different specimens; wiping down tools used in examination of evidence to avoid transfer; changing surfaces over which examinations are conducted; and securing the laboratory.

The DNA extraction process essentially breaks open the cells in the sample, releasing the DNA. Wycoff explained to the jury that "99.9 percent of a person's DNA is the same from one person to the next. It is the point one percent that is different where the crime lab focuses." Ideally, within that point one percent difference, Wycoff stated he searches for sixteen specific areas of the DNA chain for comparisons in determining a profile. Thirteen areas are considered "core" by the FBI, which he explained "is what they would like to have." The minimum criteria require ten areas for comparison. The DNA profile developed by Wycoff from the evidence is then

compared to the profile established from a "standard" obtained from a known donor, often by swabbing the mouth for saliva samples or from blood samples.

Wycoff stated that it does not take much of a quantity of a stain to determine DNA profiles; "the size of one or two or three pin heads" is sufficient. The stains Wycoff obtained for testing in this case "were between 0.0125 nanograms per microliter, and 0.03 nanograms per microliter." Wycoff testified that "[a] nanogram is a billionth of a gram." There was testimony from Wycoff that DNA can degrade over time, but it can last for quite a long period of time "under certain conditions."

In comparing a DNA profile from a piece of evidence with a "standard" DNA profile from a known donor, Wycoff told the jury that he could not "come out as in like they do in fingerprints to say the person contributed this fingerprint to the exclusion of all others in the world." The only thing he can say is that the profiles are either consistent or inconsistent with each other; and, if consistent, "then possibly back that up with some sort of statistical calculation." Wycoff identified this statistical calculation as a "population frequency" and told the jury that as related to a DNA profile, it "means the number of times I would expect that profile to show up in the population if I profiled everybody in the world." He quantified "everybody in the world" by telling the jury that the world's population was approaching seven billion people.

Sometimes Wycoff is confronted with a stain that contains a mixture of the DNA from two or more people. He defined "mixture" as "DNA coming from more than one person ... [with] characteristics of at least two people." Wycoff described such a DNA mixture to the jury in the following manner:

> I like to use the analogy of a bowl of M & Ms. You have red M & Ms and you have green M & Ms. You mix them together and, you know, you have a mixture of red and green. Sometimes you see a whole lot of red, not a whole lot of green. You know you have more red contributing to that mixture than you do green. Sometimes it is the other way around. You have more green contributing than you do red. Sometimes it is an equal mixture. You don't know who is doing what. It is too hard to count them. You don't know. So you can just say at that point I see a mixture of red and green.

When he can make a determination that a single individual contributed the most DNA to a mixture (more reds than greens), Wycoff referred to the DNA of that individual as the "major component" in the mixture and any other contributor as a "minor component" (less greens than reds). If Wycoff cannot determine a major contributor to a mixture, he cannot make any statistical calculations as to the population frequency of any of the DNA contained in the mixture.

Initially, some of the evidence recovered from Victim's apartment was sent to the Southeast Missouri Crime Lab in June 1992, but no DNA testing was performed at that time. Nevertheless, Wycoff was not the first analyst to perform DNA testing on some of the evidence submitted in this case. Joe Roberts and Brian Hoe preceded him, and one or both of them was responsible for testing beer cans in 1998. That testing indicated that there was an insufficient amount of DNA to enable a profile to be developed.

In 2005, the Poplar Bluff police sent Wycoff several items from Victim's apartment for DNA testing. These items included the sexual assault kit performed on Victim during the autopsy, two paper towels, a piece of toilet paper with a blue seashell print, three pink-colored tissues, the knee-high nylon stocking on Victim's right leg, the knee-high nylon stocking that was tied and knotted around Victim's neck, and a piece of toilet paper with a pink seashell print which was found by the Victim's shoulder.

Wycoff obtained DNA samples to use as "standards" for comparison purposes and established DNA profiles for Victim, Defendant, and all officers present at the scene. All officers were essentially excluded as being contributors of any of the DNA found on items taken from Victim's apartment and submitted for testing, except for one paper towel used by Donwell Clark to blow his nose. Wycoff was also able to exclude Defendant as a contributor on all items submitted where DNA was located, except for the last three items listed: the two nylons and the piece of toilet paper with a pink seashell print.

 "[S]ome sort of stain identification was performed at the Southeast Missouri State Lab" on the two nylons prior to testing at Wycoff's lab, however it was determined then, presumably in 1992, that the nylons were negative for stain identification. Wycoff employed an "alternative light source ... to try to show stains that might be present" on the nylons, as "stains that are living in nature, so to speak, urine, saliva, sweat, tears, and so forth, have a tendency to fluoresce under the alternative light source." Wycoff opined that the source of the DNA extracted from the stockings and toilet tissue (found under Victim's shoulder) was biological and fluid in nature, as the alternative light source picked up areas that might be biological fluid, but he could not say whether it was saliva, blood, or another source.

On "the stocking that was tied and knotted around [Victim's] neck," cells from a single stain location yielded thirteen of the sixteen specified areas in the DNA chain and provided a "partial profile" that was "a mixture." This mixture "had male and female gender characteristics." This stocking had more "female gender characteristics," indicating that the "major contributor, or the person who contributed

the more DNA to that profile[ ] was female." As to the other "contributor," "[i]t is a mixture."

The stocking found on Victim's leg, had "10 out of 16" of the specified areas from the one location from which DNA was extracted. Wycoff "determined that Victim could not be eliminated as being a contributor to the mixture of both items [he] got a profile from." "Of the people I tested, she is still in the running for people that are probably or could be on here. It means that I could not eliminate her as being a contributor to this."

State's Exhibit 56 was the piece of toilet paper with a pink seashell print "found next to victim's shoulder." Wycoff "used the alternate light source to try to determine if there were stains that could be biological in nature that [he] could attempt DNA profiling," and he ultimately tested ten separate pieces. Wycoff "wound up with like six different areas" that contained DNA for comparison purposes, and "[o]nly on one out of the six was [he] able to make a major component determination," meaning the person who contributed the most DNA. That was the male component. "There were actually six profiles developed from the tissue.... Every one of them were mixtures[,]" meaning they contained female and male characteristics. He could not exclude Victim as a possible contributor: "[p]rofiles consistent with her were detected in those mixtures." All of the officers were eliminated as possible contributors. He further stated, "Essentially I knew that I was dealing with mixtures that were characteristics of at least two people, and that it appeared to be at least two people showing up in all six of the profiles." Wycoff also testified, "There are areas of foreign DNA that is [sic] showing up in those mixtures. It is minor and it is partial.... There is DNA in the mixture from the tissue that can't be explained by any of the profiles I developed to the reference standards in this case." Wycoff determined that the male who was the major component to the DNA stain on the tissue "could not be eliminated as being a contributor to the nylons."

Of the six profiles developed from the tissue, Wycoff "was able to determine on five of those that [Defendant] could not be eliminated as a contributor to the mixture." "And on that one area where [he] had a major component that appeared to be male, [Defendant] could not be eliminated as a source of that major component."

Wycoff determined the population frequency on the major component from that mixture on the tissue. Per the Caucasian database, Wycoff calculated he "would expect the major component from that tissue to show up in the population once in every 6.131 quadzillion people." Per the Black population, "I would expect the profile from the major component to show once in every 2.43 quintillion people."

Wycoff did not calculate population frequencies for the profiles obtained from the nylon stockings because "[t]hey were of insufficient data and the mixture was of insufficient value for me to perform statistical calculations" and he could not do statistical calculations of those types of mixtures. All he could say is that "these two individuals [referring to Victim and Defendant] could not be eliminated as a contributor." The DNA profiles obtained from the stockings were partial profiles. Wycoff could not do a statistical calculation "because of the mixture itself[,]" which was of such a nature that he "could not assign a clear major minor component type of thing." If he could not assign a clear major or minor component from the mixture, he stated he "probably can't do the statistics."

Wycoff could not say whether the source of the stain on the tissue was semen, as he "did not do any stain ID testing in the laboratory or this item[,] and did not know." All he could say is that it was "some biological matter."

Wycoff also testified, "[T]here is DNA present in small concentrations that I can't contribute to anyone. It is foreign to everybody that I tested in the case. So there is potentially another person showing up in those items.... I don't know who it belongs to at this point. I don't have a reference standard to do a comparison back to.... I would have to assume that at this point we must be dealing with at least three" and possibly as many as five people. Wycoff requested additional standards to enable him to do further comparisons. However, none were sent to him at the time of trial.

(State v. Freeman, 2008 WL 142299, at *3-9 (Mo. Ct. App. S.D. 2008) (internal footnotes and citations omitted); Resp. Exh. 12). Inasmuch as Petitioner does not rebut these factual findings by clear and convincing evidence, they are presumed to be correct. 28 U.S.C. § 2254(e)(1).

## I. Claims Addressed on the Merits

Each of Petitioner's four claims were adjudicated on the merits by the state courts; hence, federal habeas relief may be granted only if those courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). Additionally, the factual determinations of the state courts are presumed to be correct "absent 'clear and convincing

evidence' to the contrary...." Perry v. Kemna, 356 F.3d 880, 883 (8th Cir. 2004) (quoting 28 U.S.C. § 2254(e)(1)). This presumption applies regardless of whether the federal determination is made by the state trial court or by the state appellate court. Id.

Section 2254(d)(1) requires federal habeas courts to test the determination of state courts "only against 'clearly established Federal law, as determined by the Supreme Court of the United States,'" and prohibits the issuance of a writ of habeas corpus "unless the state court's decision is 'contrary to, or involved an unreasonable application of,' that clearly established law." Williams v. Taylor, 529 U.S. 3N62, 379 (2000). The federal law must be clearly established at the time petitioner's state conviction became final, and the source of doctrine for such law is limited to the United States Supreme Court. Id., 529 U.S. at 380-83.

A state court's decision is "contrary to" clearly established law if "it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." Brown v. Payton, 125 S.Ct. 1432, 1438 (2005). A decision involves an "unreasonable application" of clearly established law if "the state court applies [the Supreme Court's] precedents to the facts in an objectively unreasonable manner." Id. at 1439; Williams, 529 U.S. at 405. "Federal habeas relief is warranted only when the refusal was 'objectively unreasonable,' not when it was merely erroneous or incorrect." Carter v. Kemna, 255 F.3d 589, 592 (8th Cir. 2001) (quoting Williams, 529 U.S. at 410-11).

In Shafer v. Bowersox, the Eighth Circuit articulated the standards for subsection (1) as follows:

> The "contrary to" clause is satisfied if a state court has arrived "at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" but arrives at the opposite result. A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." A case cannot be overturned merely because it incorrectly applies federal law, for the application must also be "unreasonable."

329 F.3d 637, 646-47 (8th Cir. 2003) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 405, 411, 413 (2000)).

Under subsection (2), "a state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in state court proceedings,' only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in th record." <u>Lomholt v. Iowa</u>, 327 F.3d 748, 752 (quoting 28 U.S.C. § 2254(d)(2)) (citing 28 U.S.C. § 2254(e)(1); <u>Boyd v. Minnesota</u>, 274 F.3d 497, 501 n. 4 (8th Cir. 2001)).

<u>Insufficiency of the Evidence.</u>

The Missouri Supreme Court found there to be sufficient basis for a jury to find guilt beyond a reasonable doubt. In relevant part, the Missouri Supreme Court opined as follows:

> Defendant argues that his conviction rests on insufficient evidence in that the only evidence connecting him to the crime scene was his DNA found on several objects. He asserts that, given the transferability of the DNA, this evidence alone cannot support an inference that he was present in the victim's apartment. He suggests that unlike fingerprints, which are larger, more fragile, and more likely to be obliterated when moved, DNA traces are amenable to inadvertent and intact transfer from one locale to another. He asserts that his DNA's presence on the victim is of little significance because they were both present at a common location prior to the murder.FN5 Defendant suggests that it is likely that the jury erroneously gave the DNA the same weight as fingerprints as an indication of his presence.

> > FN5 Defendant also notes that other, unidentified traces of DNA were found on the items and suggests that this serves to further underscore DNA's transferability. The possibility of innocent transfer

was explored at trial during both direct and cross examination of a DNA criminologist, who testified that DNA can potentially be transferred from one person to another through, for example, a handshake. He also testified that wet stains transfer more easily than dry stains. But, it is not clear how an innocent transfer might have occurred in this case. No witnesses saw Defendant and the victim make contact, and Defendant recalls that, at most, he touched the victim only once by tapping her on the shoulder.

In reviewing the sufficiency of evidence, this Court limits its determination to whether a reasonable juror could have found guilt beyond a reasonable doubt. In so doing, the evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict. As such, this court will not weigh the evidence anew since "the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case."

Viewing the evidence under this standard, there is sufficient basis for a jury to find guilt beyond a reasonable doubt. The DNA analysis was reliable, scientific, and untainted. The jury was presented with evidence that Defendant's DNA was on a piece of toilet paper underneath the victim's body in her apartment. The toilet paper in her apartment's bathroom also had the same distinct pattern. As such, an inference arises that Defendant was present where this paper was found in the apartment. The opposite inference - that Defendant's DNA arrived on the tissue in some innocent manner - requires an unlikely series of events: the victim needed to bring the tissue with her that night to the VFW, to expose it to his DNA in some manner, and then, upon returning home, to either use it herself just before being murdered or for the killer to have retrieved it from her purse while cleaning the scene. But, no witness testified to seeing her with this tissue at the VFW, and no witness saw Defendant make physical contact with her. As such, nothing but speculation supports the inference of his DNA's mysterious innocent transport to her apartment, particularly when Defendant denied ever being there.

Other evidence corroborates the inference of Defendant's guilt. His DNA is consistent with the samples taken from the victim's stockings, one of which was still on her leg, the other of which was found around her neck. Here, again, his transfer theory lacks support. Testimony showed that the victim wore jeans over her stockings that night and that Defendant had no contact with her legs whatsoever. Also, there is no evidence of sneezes, coughs, or other fluid discharges that might have transferred his DNA either directly or indirectly to her at the VFW.

In addition, Defendant generally matched the description of the likely murderer given the day after the crime, and it certainly did not exclude him from being

regarded as the possible perpetrator so as to undercut the DNA determination. Given the inherent oddity and unreliability of the neighbor's dramatically more precise memory 14 years after the events, it was reasonable for a jury to disregard his more recent version as not credible.

Further, the evidence showed that Defendant had the opportunity and means to commit this crime. After both arguing and flirting with the victim, Defendant left the VFW club on foot at approximately 10:23 p.m. She left the VFW at 10:38 p.m. and drove the quarter-mile home. Given its proximity, he would have had time to arrive at her apartment. He then had at least an hour to commit this crime, though the jury may have believed that the timeframe was even longer. In addition, he left the VFW with a bottle, and the jury could have inferred that it was used in the assault. But, even without this inference regarding the bottle, the DNA evidence, the timeline, the argument and rebuffing at the VFW, and the nature of the victim's injuries supported the jury's findings that Defendant committed this crime with some object, if not the bottle itself.

FN6 The Defendant did not offer an alibi for his whereabouts that night beyond an inadmissible note written by his mother. Even if admitted and believed by the jury, the note would have left him with an hour to commit the murder and a half hour to walk the mile home at a reasonable pace.

FN7 The State's pathologist testified that the injuries could have been caused by a number of things. For example, a blow from a fist could have caused the head injury and many long, rigid, sharp objects could have caused the lower body injuries.

In sum, the location and statistical match of the DNA evidence here, together with the other evidence favorable to the verdict, show that a reasonable jury could have found guilt beyond a reasonable doubt.

(Freeman, 269 S.W.3d at 424-26 (internal citations omitted). These findings are presumed to be correct. Evans v. Luebbers, 371 F.3d 438, 441 (8th Cir. 2004). See also Rousan v. Roper, 436 F.3d 951, 958 (8th Cir. 2006) (finding that petitioner's due process/insufficiency of the evidence claim was defeated by the Missouri Supreme Court's conclusion that a reasonable juror could have found deliberation in first degree murder case beyond a reasonable doubt); Evans, 371 F.3d at 442 (same

holding in context of rejection by Missouri Court of Appeals of defendant's insufficiency of the evidence challenge to first degree murder conviction).

## A.    Ground 1

Petitioner first argues that the Missouri Supreme Court made an unreasonable finding of fact in determining that the DNA on the toilet paper in the victim's apartment came from two persons, Petitioner and the victim contrary to the testimony of the State's expert.

Due Process and the Sixth Amendment "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." United States v. Gaudin, 515 U.S. 506, 510 (1995); Johns v. Bowersox, 203 F.3d 538, 543 (8th Cir. 2000) (quoting Gaudin, 515 U.S. at 510).  Consequently, Petitioner is entitled to habeas corpus relief under § 2254 "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979); Nance v. Norris, 392 F.3d 284, 289-90 (8th Cir. 2004) (quoting Jackson, 443 U.S. at 324).  The scope of habeas review of such a claim is "extremely limited." Skillicorn v. Luebbers, 475 F.3d 965, 977 (8th Cir. 2007).  Importantly, this limited review means that when "a reviewing court [is] 'faced with a record of historical facts that supports conflicting inferences [the reviewing court] must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" McDaniel v. Brown, 558 U.S. 120, 133 (2010) (per curiam) (quoting Jackson, 443 U.S. at 326)); accord Miller v. Leapley, 34 F.3d 582, 585 (8th Cir. 1994) (a federal habeas court "must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and . . . must defer to that resolution" (citing Jackson, 443 U.S. at 326)).  The

question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (citation omitted); Skillicorn, 475 F.3d at 977 (quoting Jackson, 443 U.S. at 319). It is "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. This Court, "'must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and ... must defer to that resolution.'" Whitehead v. Dormire, 340 F.3d 532, 536 (8th Cir. 2003) (quoting Sexton v. Kemna, 278 F.3d 808, 814 (8th Cir. 2002)). Additionally, the federal habeas court may not make its own determinations of witness credibility, for that determination is for the state court trier of fact. Robinson v. LaFleur, 225 F.3d 950, 954 (8th Cir. 2000); accord Gibbs v. Kemna, 192 F.3d 1173, 1176 (8th Cir. 1999) (rejecting challenge to sufficiency of evidence of state court conviction where habeas petitioner's arguments were directed to reliability or credibility of witnesses). Petitioner is entitled to federal habeas relief on this ground only if this Court "find[s] the [state appellate court's] conclusion that the evidence satisfied the Jackson sufficiency of evidence standard [is] 'both incorrect and unreasonable.'" Garrison v. Burt, 637 F.3d 849, 855 (8th Cir. 2011) (quoting Cole v. Roper, 623 F.3d 1183, 1187 (8th Cir. 2010), cert. denied, __ U.S. __, 132 S. Ct. 147 (Oct. 3, 2011)).

The evidence presented at trial demonstrated that Petitioner's DNA was on a piece of toilet paper found underneath the victim's body in her apartment, and the toilet paper in her apartment's bathroom also had the same distinct pattern. Although an unidentified trace of DNA was found on the piece of toilet paper, this did not explain how Petitioner's DNA could have been transferred at the club inasmuch as no witness saw Petitioner make physical contact with the victim, or saw the

victim with the tissue. Moreover, Petitioner's own testimony was that his only contact with the victim at the VFW was limited to tapping her on the shoulder. Further, other evidence presented at trial corroborated the inference of Petitioner's guilt including his DNA to be consistent with the samples taken from the victim's stockings, one of which was still on her leg and the other was found around her neck. Moreover, Petitioner generally matched the description of the murderer given the day after the crime. Under Jackson, after viewing the evidence in the light most favorable to the State, any rational juror could have found that Petitioner was present where this toilet paper was found in the apartment. Therefore, Petitioner's first ground for habeas relief should be denied.

The standard for reviewing the sufficiency of the evidence is set forth in Jackson v. Virginia, 443 U.S. 307 (1979). In Jackson, the United States Supreme Court held that the appropriate inquiry under the due process for reviewing the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Further, "[t]he state is 'not required to rule out every hypothesis except that of guilt beyond a reasonable doubt.'" Flieger v. Delo, 16 F.3d 878, 883 (8th Cir. 1994) (quoting Perez v. Groose, 973 F.2d 630, 634 (8th Cir. 1992)). The federal court "must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and must defer to that resolution." Miller v. Leapley, 34 F.3d 582, 585 (8th Cir. 1994). The Eighth Circuit Court of Appeals has "recognized that the verdict 'may be based in whole or in part on circumstantial evidence.'" Hill v. Norris, 96 F.3d 1085, 1088 (8th Cir. 1996) (quoting United States v. Anderson, 78 F.3d 420, 422 (8th Cir. 1996)). A review of the record reveals that the evidence adduced at trial was clearly sufficient to support a guilty verdict.

A review of the record reveals that the evidence adduced at trial was clearly sufficient to support a guilty verdict. "Under Missouri law, '[a] person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter.'" Bounds v. Delo, 151 F.3d 1116, 1118 (8th Cir. 1998) (quoting Mo. Rev. Stat. § 565.020.1). "'A person 'acts knowingly' ... [w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result.'" Id. at 1118 n. 4. (quoting Mo. Rev. Stat. § 562.016.3) (alterations in original). "Deliberation is defined as 'cool reflection for any length of time no matter how brief.'" Id. (quoting Mo. Rev. Stat. § 565.002(3)). Also, "under Missouri law a jury may infer the elements of first degree murder 'from indirect evidence and the circumstances surrounding the murder.'" Id. at 1119 (quoting Flieger v. Delo, 16 F.3d 878, 883 (8th Cir. 1994). See also United States v. Looking Cloud, 419 F.3d 781, 789 (8th Cir. 2005) ("Either direct or circumstantial evidence may provide a basis for conviction; adducing direct evidence at trial is not a requirement."); Hill v. Norris, 96 F.3d 1085, 1088 (8th Cir. 1996) ("Each of the elements of the crime charged may be proven by circumstantial evidence, as well as by direct evidence.").

To the extent Petitioner urges circumstantial evidence is insufficient to support the conviction because it does not exclude other factual scenarios consistent with his innocence, such an argument lacks merit. Hill v. Norris, 96 F.3d 1085, 1088 (8th Cir. 1996)(relying on Jackson, 443 U.S. at 325, 326)). Importantly, in Missouri circumstantial evidence is given the same weight as direct evidence, State v. Brooks, 158 S.W.3d 841, 848 (Mo. Ct. App. 2005), and circumstantial evidence can be sufficient to sustain a conviction for first-degree murder. State v. Sidebottom, 753 S.W.2d. 915, (Mo. 1988) The state is "not required to rule out every hypothesis except that of guilt beyond a

reasonable doubt." Perez v. Groose, 973 F.2d 630, 634 (8th Cir. 1992). The state supreme court properly decided that the evidence was sufficient to support the first-degree murder conviction.

It is well established that State law defines the elements of State-law crimes. Fenske v. Thalacker, 60 F.3d 478, 480 (8th Cir. 1995); Turner v. Armontrout, 845 F.2d 165, 168 (8th Cir. 1988). As such, a state court's conclusion that the evidence was sufficient to support a criminal conviction is entitled to great deference by a federal court. Jackson, 443 U.S. at 323.

The State Court's findings and conclusions are not contrary to, nor do they involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; nor did they result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The State Court's findings are based on rules of evidence that correspond to federal law.

Based on the above, the state court's decision denying Petitioner relief is well based on law and fact. The undersigned is unaware of any "clearly established Federal law, as determined by the Supreme Court of the United States" of which the court's decision runs afoul, nor has Petitioner demonstrated such. Therefore, it cannot be said that the state court's adjudication of the instant claim "resulted in a decision that was contrary to, or involved an unreasonable application of," clearly established federal law. 28 U.S.C. §2254(d)(1). Neither has Petitioner shown that the court's determination "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As such, the instant claim should be denied. 28 U.S.C. §2254(d).

**B.**     **Ground 2**

In Ground 2 of the instant petition, Petitioner contends that it was an unreasonable determination of fact for the Missouri Supreme Court to conclude that he could have reached the victim's apartment in time to commit the murder. In particular, Petitioner argues the Missouri Supreme Court unreasonably determined that given the proximity of the VFW to the victim's apartment, Petitioner had time to get to the victim's apartment. Petitioner notes that the victim lived 1, 208 feet from the VFW, and he left on foot while the victim drove to her apartment. Petitioner argues that inasmuch as he did not know where the victim lived, he would have had to follow her car on foot to her apartment, and he could not have arrived in time to follow the victim into her apartment.

The Missouri Supreme Court found that Petitioner left the VFW on foot at 10:23 after both arguing and flirting with the victim and given the proximity of the apartment, he would have had time to arrive at her apartment. Freeman, 269 S.W.3d at 426. Both Petitioner and the victim were regulars at the VFW and were at the VFW for a couple of hours on the evening of May 6, 1992 socializing and drinking. Witnesses at the VFW observed the victim and Petitioner arguing with each other using raised voices, and Petitioner offering to buy the victim a drink. Under Jackson, after viewing the evidence in the light most favorable to the State, any rational juror could have found that Petitioner had sufficient time to reach the victim's apartment to commit the murder. Therefore, Petitioner's second ground for habeas relief should be denied.

To the extent Petitioner urges circumstantial evidence is insufficient to support the conviction because it does not exclude other factual scenarios consistent with his innocence, such an argument lacks merit. Hill v. Norris, 96 F.3d 1085, 1088 (8th Cir. 1996)(relying on Jackson, 443 U.S. at 325,

326)).  Importantly, in Missouri circumstantial evidence is given the same weight as direct evidence, State v. Brooks**,** 158 S.W.3d 841, 848 (Mo. Ct. App. 2005), and circumstantial evidence can be sufficient to sustain a conviction for first-degree murder.  State v. Sidebottom, 753 S.W.2d. 915, (Mo. 1988)  The state is "not required to rule out every hypothesis except that of guilt beyond a reasonable doubt."  Perez v. Groose, 973 F.2d 630, 634 (8th Cir. 1992).  The state supreme court properly decided that the evidence was sufficient to support the first-degree murder conviction.

It is well established that State law defines the elements of State-law crimes.  Fenske v. Thalacker, 60 F.3d 478, 480 (8th Cir. 1995); Turner v. Armontrout, 845 F.2d 165, 168 (8th Cir. 1988).  As such, a state court's conclusion that the evidence was sufficient to support a criminal conviction is entitled to great deference by a federal court.  Jackson, 443 U.S. at 323.

The State Court's findings and conclusions are not contrary to, nor do they involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; nor did they result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  The State Court's findings are based on rules of evidence that correspond to federal law.

Based on the above, the state court's decision denying Petitioner relief is well based on law and fact.  The undersigned is unaware of any "clearly established Federal law, as determined by the Supreme Court of the United States" of which the court's decision runs afoul, nor has Petitioner demonstrated such.  Therefore, it cannot be said that the state court's adjudication of the instant claim "resulted in a decision that was contrary to, or involved an unreasonable application of," clearly established federal law.  28 U.S.C. §2254(d)(1).  Neither has Petitioner shown that the court's determination "resulted in a decision that was based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As such, the instant claim should be denied. 28 U.S.C. §2254(d).

## C.     **Ground 3**

In Ground 3, Petitioner contends that the Missouri Supreme Court upholding his conviction was inconsistent with a reasonable determination of the facts, because he contends the liqueur bottle he took with him from the VFW was not consistent with the instrument that caused the victim's injuries.

As shown by the facts as set out by the Missouri Court of Appeals, a reasonable juror could find that the some of the victim's injuries were caused by a long, rigid object with some kind of ridge on it such as the Galliano liqueur bottle Petitioner took with him that night from the VFW. The evidence showed the victim had a bruise behind her right ear consistent with being caused by a fist or by some other hard, smooth object and scratches inside her vagina caused by something other than a penis but an object that was rigid, with a corner or an edge to it, that was probably six or eight inches long. Accordingly, the Missouri Supreme Court's determination that there was sufficient evidence to convict Petitioner is supported by the record and entitled to deference. This Court is unaware of any "clearly established Federal law, as determined by the Supreme Court of the United States" of which the court's decision runs afoul, not has Petitioner demonstrated such. Therefore, it cannot be said that the State court's determination "resulted in a decision that was contrary to, or involved an unreasonable application of," clearly established federal law. 28 U.S.C. § 2254(d)(1). Nor has Petitioner shown that the court's determination "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d)(2).  As such, the instant claim should be denied.  28 U.S.C. § 2254(d).

**D.**     <u>Ground 4</u>

In Ground 4, Petitioner contends that  the Missouri Supreme Court unreasonably applied <u>Jackson v. Virginia</u>.

Construing the evidence in the light most favorable to the prosecution and deferring to the jury's resolution of any conflicts in favor of the prosecution, there was sufficient evidence to support Petitioner's conviction.

Petitioner's arguments to the contrary were appropriate for argument to the jury but are not convincing here.  Petitioner relies on the DNA expert's testimony that DNA from three people was on the toilet paper in the victim's apartment and thus the jury must have believed testimony about the victim's DNA and his DNA being on the toilet paper, but unreasonably disbelieved the testimony about trace amounts the absence of an unknown third person's DNA being present for the jury to convict him.

The prosecution is not under an affirmative duty to rule out every hypothesis except that of guilty beyond a reasonable doubt.  <u>Jackson</u>, 443 U.S. at 326.  A defendant may encourage speculation and offer alternative theories to exculpate himself, but it is the role of the jury to sift through the testimony, to filter out fact from fiction and determine from the evidence presented, the defendant's guilt or innocence.  Based on the evidence, the jury was entitled to conclude that Petitioner was guilty of first degree murder.

Petitioner supports his position by pointing to what he considers to be inconsistencies in the testimony and evidence presented at trial.  This habeas court must, however, presume the jury

"'resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" McDaniel, 558 U.S. at 133 (quoting Jackson, 443 U.S. at 326)); accord Miller, 34 F.3d at 585 (a federal habeas court "must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and we must defer to that resolution" (citing Jackson, 443 U.S. at 326)).

When reviewing the sufficiency of the evidence, this Court must view the evidence in a light most favorable to the prosecution. Jackson, 443 U.S. at 326. "[A] federal habeas corpus court faced with a record of historical facts that support conflicting inferences must presume ... that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Turner v. Armontrout, 845 F.2d 165, 168 (8th Cir. 1988) (quoting Jackson, 443 U.S. at 326). "This standard recognizes that it is the province of the fact-finder, not this court, 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basis facts to ultimate facts.'" Sera v. Norris, 400 F.3d 538, 543 (8th Cir. 2005) (quoting Jackson, 443 U.S. at 318-19)). After examining the evidence presented at trial, the undersigned finds that a reasonable jury could conclude that whether or not the presence of a third person's DNA was on the toilet paper, the jury could conclude that Petitioner's DNA was on the toilet paper because he was in the victim's apartment. The state court decision is not contrary to or an unreasonable application of Jackson; and constituted a reasonable determination of the facts based on the evidence presented. Ground four is without merit.

The state court's rejection of Petitioner's claim constituted adjudication on the merits of this claim and must be reviewed under the deferential provisions of 28 U.S.C. § 2254(d)(1). Section 2254(d)(1) requires federal habeas courts to test the findings of state courts only against clearly established federal law, as determined by the Supreme Court of the United States. Further, § 2254(d)(1) prohibits the issuance of a writ of habeas corpus unless the state court's decision is

contrary to, or involved an unreasonable application of that clearly established law. <u>Williams v. Taylor</u>, 529 U.S. 362, 379 (2000). The federal law must be clearly established at the time Petitioner's state conviction became final, and the source of doctrine for such law is limited to the United States Supreme Court. <u>Id.</u> at 380-83.

A state court's decision is contrary to clearly established Supreme Court precedent when it is opposite to the Court's conclusion on a question of law or different than the Court's conclusion on a set of materially indistinguishable facts. <u>Williams</u>, 529 U.S. at 412-13; <u>Carter v. Kemna</u>, 255 F.3d 589, 591 (8th Cir. 2001). A state court's determination is an unreasonable application of Supreme Court precedent if it unreasonably refuses to extend a legal principle to a new context where it should apply. <u>Carter</u>, 255 F.3d at 592 (citing <u>Williams</u>, 529 U.S. at 407). "Federal habeas relief is warranted only when the refusal was 'objectively unreasonable,' not when it was merely erroneous or incorrect." <u>Id.</u> (quoting <u>Williams</u>, 529 U.S. at 410-11).

Based on the above, the state court's decision denying Petitioner relief is well based on law and fact. This Court is unaware of any "clearly established Federal law, as determined by the Supreme Court of the United States" of which the court's decision runs afoul, nor has Petitioner demonstrated such. Therefore, it cannot be said that the state court's adjudication of the instant claim "resulted in a decision that was contrary to, or involved an unreasonable application of," clearly established federal law. 28 U.S.C. §2254(d)(1). Neither has Petitioner shown that the court's determination "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As such, the instant claim should be denied. 28 U.S.C. §2254(d).

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253, an appeal may not be taken to the court of appeals from the final order in a 28 U.S.C. § 2254 proceeding unless a circuit judge or judge issues a Certificate of Appealability.  28 U.S.C. § 2253(c)(1)(A).  To grant such a certificate, the justice or judge must find a substantial showing of the denial of a federal constitutional right.  Id. § 2253(c)(2); *see* Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997).  A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings.  Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997).  The undersigned finds that reasonable jurists could not differ on any of Petitioner's claims, so the Court will deny a Certificate of Appealability on all claims.  Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that Petitioner Samuel Freeman's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Docket No. 1) be dismissed without further proceedings.

**IT IS FURTHER ORDERED** that no certificate of appealability shall issue in this cause inasmuch as   Petitioner  has  failed  to  make  a  substantial  showing  that  he  has  been  denied  a constitutional right.

A separate judgment in accordance with this Memorandum and Order is entered this same date.


   /s/ Terry I. Adelman
   UNITED STATES MAGISTRATE JUDGE

Dated this  19th   day of March, 2014.

- 27 -